IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PELLEGRINI *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | No. 1:14-cv-00180-VJW |
| | ) | |
| v. | ) | Hon. Victor J. Wolski |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENANT'S MOTION TO DISMISS, IN PART, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND FOR A MORE DEFINITE STATEMENT**

Dated: May 5, 2014

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division


STEPHEN FINN
Trial Attorney
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Tel:    (202) 305-3284
Fax:    (202) 514-8865
stephen.finn@usdoj.gov

SHELDON G. SHUFF
SUSAN E. SYMANSKI
Assistant District Counsel
US Army Corps of Engineers
Jacksonville District
701 San Marco Blvd
Jacksonvill, FL 32207

Attorney for the United States

# TABLE OF CONTENTS

QUESTIONS PRESENTED ........................................................................................... 2

STATEMENT OF THE CASE ...................................................................................... 2

    I.      PRIOR LITIGATION AND PROCEDURAL BACKGROUND .......................... 2

    II.     FACTUAL BACKGROUND ................................................................. 5

         a.     The Saint Johns River and Jacksonville Harbor Navigation Project ......... 5

         b.     The Pellegrinis' and Ms. Ebel ................................................................... 8

ARGUMENT ............................................................................................................. 10

    I.      STANDARD OF REVIEW ................................................................ 10

         a.     RCFC 12(b)(6), Failure to State a Claim Upon Which Relief Can be Granted ........................................................................................................ 10

         b.     RCFC 56, Summary Judgment ................................................................. 10

         c.     RCFC 12(e), Motion for More a Definite Statement ................................ 11

    II.     Plaintiffs Have No Right To Compensation For A Takings For Alleged Property Damage Occurring Within the Government's Navigational Servitude ............... 12

         a.     Claims for Physical Takings and the Navigational Servitude .................. 13

         b.     Plaintiffs' Complaint Asserts, On Its Face, A Non-Compensable Takings Claim Within the Navigational Servitude .................................................. 14

         c.     The Jacksonville Harbor Navigation Project Was A Congressionally Authorized Project Within the Navigable Waters of the United States, And to the Extent Plaintiffs Possess a Cognizable Property Interest in Adjacent Property or Their Permits to Build on State Submerged Lands, The United States Navigational Servitude is Dominant and Plaintiffs May Not Claim  Compensation ........................................................................ 17

    III.    Plaintiffs Remaining Claims Lack Dates to Support Their Allegations and Are Vague and Ambiguous ........................................................................................ 19

CONCLUSION .......................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Alameda Gateway Ltd. v. United States,*
  45 Fed. Cl. 757 (1999) ........................................................................................14, 17

*Alliance of Descendants of Tex. Land Grants v. United States*,
  37 F.3d 1478 (Fed. Cir. 1994) ...................................................................................20

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................................10

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................................10

*Brace v. United States*,
  72 Fed. Cl. 337 (2006) ...............................................................................................13

*Brown v. Legal Found. of Washington*,
  538 U.S. 216 (2003) ...................................................................................................13

*Brown Park Estates-Fairfield Dev. Co. v. United States*,
  127 F.3d 1449 (Fed. Cir. 1997) ..................................................................................20

*Canadian Pacific Ltd., v. United States*,
  534 F.2d 1165 (5th Cir. 1976) ...................................................................................18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................................................11

*Chicago, B. & Q.R. Co. v. Chicago*,
  166 U.S. 226 (1897) .....................................................................................................4

*City of Gettysburg, South Dakota, v. United States*,
  64 Fed.Cl. 429 (2005) ...........................................................................................14, 16

*Coastal Petroleum v. Chiles*,
  701 So.2d 619 (Fla. App. 1997) ............................................................................15, 19

*Forest Props., Inc. v. United States*,
  177 F.3d 1360 (Fed Cir.1999) ....................................................................................13

*Gal–Or v. United States,*
  93 Fed. Cl. 200 (2010) ...............................................................................................12

*Kaiser Aetna v. United States*,
  444 U.S. 164 (1979) ...............................................................................................13, 17

*Marine One, Inc. v. Mantee County,*
    898 F.2d 1490 (11th Cir. 1990) ........................................................15

*Mass. Bonding & Ins. Co. v. Lawson,*
    149 F.2d 853 (5th Cir. 1945) ..........................................................18

*Mildenberger v. United States,*
    91 Fed. Cl. 217 (2010), *aff'd* 643 F.3d 938 (2011)..................................11, 19, 20

*Northwest Louisiana Fish & Game Preserve Comm'n v. United States,*
    574 F.3d 1386 (Fed. Cir. 2009)........................................................13, 16

*Owen v. United States,*
    851 F.2d 1404 (Fed. Cir. 1988)..................................12, 13, 14, 17, 18, 19

*Pellegrini v. United States,*
    103 Fed.Cl. 47 (2012) ..............................................................2, 3, 4, 14

*Sommers Oil. Co. v. United States,*
    241 F.3d 1375 (Fed. Cir. 2001).........................................................10

*Stop the Beach Renourishment, Inc. v. Fla. Dept. of Environmental Protection,*
    560 U.S. 702 (2010) ..................................................................15

*Tri-State Materials Corp. v. United States,*
    550 F.2d 1 (1997).....................................................................17

*United States v. Chi. Milwaukee, St. Paul, & Pac. R.R.,*
    312 U.S. 592 (1941) ..................................................................16

*United States v Kansas City Ins. Co.,*
    339 U.S. 799 (1950) ..................................................................16

*United States v. Rands,*
    389 U.S. 121 (1967)..................................................................13

*United States v. Tilton,*
    705 F.2d 429 (11th Cir. 1983) .........................................................18

## STATUTES

28 U.S.C. § 1491(a)(1)..............................................................4

28 U.S.C. § 1500.....................................................................3

33 U.S.C. § 1........................................................................16

Pub. L. No. 106-53, § 101(a)(17), 113 Stat. 269 ........................................................7, 17

Pub. L. No. 110-161, Table V ..........................................................................................7

Pub. L. No. 111-85, 123 Stat. 2845 ................................................................................8

# REGULATIONS

33 C.F.R. § 322.5 (2004) ................................................................................................16

# RULES

RCFC 12(b)(6) ..........................................................................................................1, 10

RCFC 12(d) ....................................................................................................................10

RCFC 12(e) ............................................................................................1, 11, 12, 19

RCFC 56 .........................................................................................................................10

RCFC 56(a) ...............................................................................................................1, 11

RCFC 56(c)(1)(A) ...........................................................................................................11

## DEFENDANT'S MOTION TO DISMISS, IN PART, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGEMENT, AND FOR A MORE DEFINITE STATEMENT

Pursuant to Rules 12(b)(6), and 56(a) of the Rules of the Court of Federal Claims ("RCFC"), Defendant, the United States, moves to dismiss, in part, Plaintiffs' complaint for failure to state a claim upon which relief may be granted or, in the alternative, for summary judgment. In addition, Defendant moves for a more definite statement under RCFC 12(e).

Plaintiffs allege in their Complaint that they have a "right to use adjacent property for the maintenance of a dock and seawall," and they seek compensation for damages to such structures. However, any right Plaintiffs may possess under Florida law to the use of the submerged lands adjacent to their property is subject to the federal government's dominant navigational servitude. Plaintiffs' Complaint acknowledges that United States Army Corps of Engineers' dredging in the St. Johns River was conducted to improve navigation. Plaintiffs' Complaint also acknowledges the distinction between uplands and the federal government's navigational servitude that exists below the mean high water mark. Therefore, to the extent Plaintiffs are alleging a taking of property interests that are subject to the federal navigational servitude, those claims should be dismissed or, in the alternative, summary judgment on those claims should be entered for the United States.

In regards to Plaintiffs' remaining claim, Plaintiffs' Complaint is vague and ambiguous. First, it lacks any dates describing when the material events occurred that gave rise to their claim. Although Defendant is cognizant of the prior claims filed by Plaintiffs, the Complaint on its face should provide a clearer statement of the dates Plaintiffs allege the United States performed acts that caused a taking of Plaintiffs' property rights. Second, Plaintiffs should provide dates in the Complaint of the alleged taking. Finally, Plaintiff,s statement of their cognizable property

interests is also vague and ambiguous.  Plaintiffs should be required to file a more definite statement.

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, IN PART OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGEMENT, AND FOR A MORE DEFINITE STATEMENT

### QUESTIONS PRESENTED

Whether Plaintiffs fail to state a claim upon which relief may be granted where Plaintiffs' takings claim alleges a taking of property that is not cognizable and is nevertheless subject to Defendant's navigational servitude?

Whether, in the alternative, summary judgment should be entered for Defendant as to the alleged taking of property rights that are subject to the federal navigational servitude?

Whether Plaintiffs' Complaint that provides no dates for the alleged activities of the United States Army Corps of Engineers that caused harm to Plaintiffs' property or dates for the injuries to Plaintiffs' property, and lacks a clear statement of Plaintiffs' cognizable property interest, is vague and ambiguous such that Plaintiffs should be required to file a more definite statement?

### STATEMENT OF THE CASE

### I.    PRIOR LITIGATION AND PROCEDURAL BACKGROUND

Plaintiffs, Anne G. Ebel, Donald L. Pellegrini, and Brenda J. Pellegrini, filed their complaint in this matter on March 5, 2014, (Compl.) ECF No. 1.  Previously, Plaintiffs filed a complaint against the United States in the United States District Court of the Middle District of Florida on July 22, 2010.  *Ebel v. United States*, No. 3:10-cv-635-RBD-JRK (M.D. Fla. 2010) (ECF No. 1); *see Pellegrini v. United States*, 103 Fed.Cl. 47, 49 (2012).  In the district court complaint, Plaintiffs asserted that the United States was liable for negligence under the Federal

Torts Claim Act due to damage to their residential real property in Jacksonville, Florida.  *Ebel* at ECF No. 1.  They alleged that dredging in the St. Johns River by the United States Army Corps of Engineers ("Corps") "in Cuts 40-41, in the vicinity of buoy 34, immediately adjacent to the property owned by the Plaintiffs . . . created a condition that damaged" their real property due to the loss of lateral and subjacent support above the mean high-water mark.  *Id.* at ¶¶ 4-5.

On April 11, 2011, while the district court action was pending, Plaintiffs, the Pellegrinis, Ms. Ebel, and Mladen Ziza and Beverly Ziza, filed a complaint in the United States Court of Federal Claims ("CFC") seeking monetary damages, and general, equitable, declaratory, and injunctive relief from the United States as a result of the alleged taking of their property. *Pellegrini*, 103 Fed. Cl. at 49.  On January 20, 2012, this Court granted Defendant's motion to dismiss, in part, holding that 28 U.S.C. § 1500 precluded the Court from exercising jurisdiction over the Pellegrinis' and Ms. Ebel's takings claims because those claims were "based on the same operative facts as the negligence claims they raised in *Ebel*" and that "the *Ebel* claims were pending in the district court" at the time the CFC complaint was filed.  *Pellegrini*, 103 Fed.Cl. at 53.  Subsequently, the Zizas moved for dismissal, which was granted.  *See Ziza v. United States*, No. 11-224-VJW (CFC) (ECF Nos. 25-26).  At Plaintiffs' request, the district court had dismissed their complaint on October 12, 2011.  *Ebel* at ECF No. 55.

The Pellegrinis and Ebel filed their complaint in this action on March 5, 2014, asserting a takings claim resulting from the Corps' alleged dredging activities in the St. Johns River in Florida.  *See* Comp. ¶¶ 3 & 5.  Plaintiffs assert that they are owners of waterfront residential real property in Jacksonville, Florida.  Compl. ¶¶ 1-2.  Plaintiffs repeat the substance of their prior allegations and seek compensation for a taking of the value of their property, the right to use adjacent property, and for property allegedly destroyed by the government's actions.  Compl. ¶ 3.

Plaintiffs allege that the Corps took their property as a consequence of activities that were part of the "St. Johns River Maintenance Dredge Project . . . in Cuts 40-41, in the vicinity of buoy 34, immediately adjacent to the property owned by the Plaintiffs." *Id.* ¶ 3. Plaintiffs allege that as a result of the dredge project "[t]he composition of the bottom of the River, and the angle of repose of the bottom of the River is such that the dredging in the center of the channel cause[d] a loss of lateral and subjacent support for the banks of the River." *Id.* ¶ 5. Plaintiffs allege that the loss of support for the banks of the river caused the collapse of their seawalls and adjacent structures including docks and boathouses. *Id.* Plaintiffs also allege that the United States has converted their privately-owned uplands that lie beyond the navigational servitude into public lands lying below the mean high water mark. *Id.* ¶ 6. Plaintiffs assert the Court has jurisdiction over these Fifth Amendment takings claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). *Id.* ¶ 4.[1]

Plaintiffs do not include any dates in their factual allegations regarding the taking of property or the dredging activities of the Corps. As in their prior CFC complaint, Plaintiffs allege that the property interest taken includes "the right to use the adjacent property," pre-existing structures (docks, seawalls, and boathouses), and the "privately-owned uplands lying outside defendant's navigational servitude" that were converted to public lands when they collapsed in to the river. *Cf. Id.* ¶¶ 4-5 *with Pellegrini*, 103 Fed. Cl. at 49.

---

[1] Similar to their prior complaint in this Court, Plaintiffs also seek compensation under the Fifth Amendment due process clause. Compl. ¶ 3. As this Court noted previously, this cause of action is redundant. *Pellegrini*, 103 Fed.Cl. at 49, n.2 (citing *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 241 (1897)).

## II.    FACTUAL BACKGROUND

### a.    The Saint Johns River and Jacksonville Harbor Navigation Project

The Jacksonville Harbor Federal Navigation Project is a deep draft channel within the St. Johns River that serves large commercial bulk and container traffic as well as some U.S. Navy vessels.  Ex. 1 (Final Feasibility Report, Jacksonville Harbor, Duval County, Florida, Navigation Study at 7 (1998) ("1998 Final Feasibility Report"))[2].  "The St. Johns River rises in east-central Florida, and flows northerly for 257 miles to Jacksonville, Fla., and thence easterly 28 miles in a winding course to the Atlantic Ocean."  Ex. 2 (Letter from Sect. of War to Senate Commerce Committee, S. Doc. No. 79-179, at 2 (1946) ("S. Doc. No. 79-179")).  The river is tidal for the lower 120 miles and, in its original condition, from the mouth to Jacksonville (24-28 miles), was navigable with a limited depth of shoal reaches of about 12 feet at mean low water.  Ex. 3 (Extract, Annual Report of the Chief of Engineers at 775-76 (1922)); Ex. 4 (Letter from the Secretary of the Army to the Committee on Public Works, H. Doc. No. 89-214, at 8-9 (1965) ("H. Doc. No. 89-214")); Ex. 1 (1998 Final Feasibility Report at 7-8 (describing the St. Johns River in the vicinity of Jacksonville in about 1562)).  Since 1869, there has been a continuing federal "[i]nterest in improving the St. Johns River from Jacksonville to the Atlantic Ocean for deep draft commercial vessels."  Ex. 1 (1998 Final Feasibility Report at 4).  Plaintiffs allege that their riparian property is located on Ramoth Drive, Compl. ¶¶ 1-2, which is on Little Marsh Island.  Ex. 5 (Permit Application for DHF Consulting, Inc. to Atlantic Permits Section & Jacksonville Regulatory Office, U.S. Army Corps of Engineers, Jun. 28, 2010 at 2017).

By 1946, the federal government had dredged a ship channel from Jacksonville to the river's mouth providing a continuous depth of 30 feet at mean low water.  Ex. 2 (S. Doc. No. 79-

---

[2]   Due to size constraints for purposes of electronic filing, the report that constitutes Exhibit 1 has been submitted in full, however, of the appendixes only an abbreviated copy of Appendix A has been provided.

179, at 2, 5). However, due to navigational difficulties created by the larger vessels being used

after World War II, commercial and shipping interests requested that the ship channel be

straightened from Dames Point to St. Johns Bluff. *Id.* at 2, 5, & 12. Although prior dredging

and widening of the channel had improved navigation, vessels continued to encounter significant

difficulty at Dames Point and the Fulton-St. Johns Bluff bends. Ex. 2 (S. Doc. No. 79-179 at 23-

24). Navigation at Dames Point and Clapboard Creek was especially difficult. *Id.* at 24. At

Clapboard Creek, strong tidal currents during ebb tides forced vessels to the opposite shore. *Id.*

As a result, the Chief of Engineers concurred in the recommendation to Congress of the Board of

Engineers for Rivers and Harbors, War Department, for the construction of a cut-off channel

from St. Johns Bluff to Dames Point. *Id.* at 1. However, tidal velocities were expected to

increase at Dames Point and the Fulton-St. Johns Bluff bend as a result of the construction of the

cut-off channel. *Id.* at 26.

By 1951, construction of the Dames Point and Fulton-St. Johns Bluff cutoff and

deepening of the shipping channel to 34-feet had been completed. Ex. 4 (H. Doc. No. 89-214 at

13). Due to increased shipping tonnages and the use of deeper draft oil tankers, by 1965 the

Chief of Engineers recommended that the shipping channel in the St. Johns River be dredged to

38-feet. *Id.* at 3, 9, 16, 20, 24, 31. In addition, he recommended widening of the shipping

channel in the vicinity of St. Johns Bluff due to strong cross currents. *Id.* at 10, 29, 31.

In 1992 to accommodate deeper draft shipping into Jacksonville Harbor, the United

States House of Representatives Committee on Public Works and Transportation passed a

resolution authorizing the Board of Engineers for Rivers and Harbors to review the 1965 report

of the Chief of Engineers, ex. 4 H. Doc. No. 89-214, "to determine whether modifications of the

recommendations contained therein are advisable at the present time, in the interest of navigation

and other purposes." Ex. 1 (1998 Final Feasibility Report at 4). The Chief of Engineers

submitted the final response and feasibility report to the Secretary of the Army on April 21,

1999, recommending modifications to the main shipping channel. Ex. 6 (Letter from Chief of

Engineers to Secretary of the Army dated Apr. 21, 1999, at ¶ 2). The Chief of Engineers

concurred in the feasibility report which recommended modifications to the channel to include

realigning the channel along Cuts 39 through 41, in the vicinity of the St. Johns Bluff-Fulton

Cut, and deepening the channel to 39 feet. *Id.*; Ex. 1 (1998 Final Feasibility Report at 52). In

the Water Resource Development Act of 1999, Congress authorized the project and the

construction portion of the project was completed by 2003. *See* Jacksonville Harbor Navigation

Study, Final Integrated General Evaluation Report and Supplemental Environmental Impact

Statement, February 2014, at iii,

http://www.saj.usace.army.mil/Missions/CivilWorks/Navigation/NavigationProjects/Jacksonville

HarborChannelDeepeningStudy.aspx (follow "Final Report" hyperlink); Pub. L. No. 106-53, §

101(a)(17), 113 Stat. 269, 276.

In addition to realignment of the shipping channel to the north, ex. 1 (1998 Final

Feasibility Report, Appendix A, Engineering, at 35, 52, & Appendix A, Engineering, at Plate

11), the project included plans for maintenance dredging along the entire channel. Cuts 40 and

41 were included in plans for advance maintenance dredging within the channel boundaries. Ex.

1 (1998 Final Feasibility Report at 39-42; Appendix A, Engineering, at Plate 3). In 2008, the

Corps contracted for emergency dredging in Cuts 40 and 41.[3] Ex. 7 (Letter to Norfolk Dredging

Company from North Florida Area Office, Jacksonville District Corps of Engineers dated Dec.

19, 2007) ("2007 Contract Mod. Letter"); Ex. 8 (Contract Modification, W912EP-07-C-0015).

---

[3] Funds for the dredging project were appropriated under the Energy and Water Development
and Related Agencies Appropriations Act, 2008, Pub. L. No. 110-161, Title V (table at 690).

Dredging in Cut 40 was entirely on the south side of the shipping channel. Ex. 7 (2007 Contract Mod. Letter at drawing nos. 22/54 & 21/54).

The northern boundary of the shipping channel in Cut 40 is approximately 800 feet from the shore of Little Marsh Island and the area of dredging was approximately 1300 feet from the same. *Id.* at drawing no. 22/54). The dredging in Cut 41 was along the northern border of the shipping channel approximately 900 feet from the shore of Little Marsh Island. *Id.* at drawing nos. 22/54 & 23/54. The dredging in the area of Cuts 40 and 41 took place from March 15 to March 19, 2008. Ex. 9 (Contractors Quality Control Reports, Daily Log of Construction, Contract Number W912EP-10-C-0015, reports 226-230). In 2010, the Corps again contracted for maintenance dredging in Cut 41 proximate to the location of the 2008 dredging.[4] Ex. 10 (Solicitation, Offer, and Award, to Great Lakes Dredge & Dock Co., LLC, dated Jan. 22, 2010) ; Ex. 11 (Plans for Maintenance Dredging 40-Foot Project Bar Cut-3 through Cut-45, 2010, plates C-110 & C-111). Dredging in Cut 41 occurred on May 13, and 14, 2010. Ex. 12 (Contractors Quality Control Reports, Daily Log of Construction, Contract Number W912EP-10-C-0016, reports 90-91).

b.      **The Pellegrinis' and Ms. Ebel**

The Pellegrinis live at 7048 Ramoth Drive, Jacksonville, Florida, having purchased the property in December 1999. Compl. ¶ 1; Ex. 13 (Warranty Deed dated Dec. 11, 1991). Ms. Ebel lives at 7036 Ramoth Drive and purchased her property in November 2005. Compl. ¶ 2; Ex. 14 (Quitclaim Deed dated Nov. 1, 2005). On June 15, 1999, the Corps approved the Pellegrinis' request to construct a single family dock, access walkway, covered terminal platform, and a boat slip and lift in, or affecting, navigable waters of the United States. Ex. 15

---

[4] Funds for this dredging project were appropriated under the Energy and Water Development and Related Agencies Appropriations Act, 2010, Pub. L. No. 111-85, 123 Stat. 2845; H.R. Conf. Rep. No. 111-278, at 201 (2009).

(Pellegrini Permit Approval at 1001). Diagrams of the planned construction indicate that the pilings supporting the dock, walkway, platform, slip, and lift were on state sovereign submerged lands and under the mean high water mark, as was the existing bulkhead. *Id.* at 1009. In 1999, the Pellegrinis also obtained authorization from the Florida Department of Environmental Protection to use the submerged lands for a single family dock. *Id.* at 1044-49.

On March 28, 2008, the Pellegrinis contacted the Port of Jacksonville reporting that they had lost their dock and personal property on March 8, 2008, and asserting that Corps' dredging had caused the damage. Ex. 16 (E-mail, with forwards, from Brenda Pellegrini to various officials of the Port of Jacksonville, Mar. 28, 2008). In 2010, the Pellegrinis and Ms. Ebel filed claims for damage with the Corps.[5] Ex. 17 (Standard Form 95, Claim for Damage, Injury, or Death, Don and Brenda Pellegrini, Jan. 12, 2010); Ex. 18 (Standard Form 95, Claim for Damage, Injury, or Death, Anne Ebel, Mar. 1, 2010). Their claims asserted that the loss was due to dredging in the shipping channel and that it occurred in a 20 minute event due to the collapse of the banks of the river and the underlying sand. Ex. 17 (Standard Form 95, Claim for Damage, Injury, or Death, Don and Brenda Pellegrini, Jan. 12, 2010); Ex. 18 (Standard Form 95, Claim for Damage, Injury, or Death, Anne Ebel, Mar. 1, 2010). Both claims were denied. Ex. 19 (Letter from Tort Claims Division, US Army Claims Service, to Ms. Anne Ebel dated May 27, 2012); Ex. 20 (Letter from Tort Claims Division, US Army Claims Service, to Mr. and Mrs. Pellegrini, Jun. 2, 2010). In 2010, Ms. Ebel applied to the Corps for a permit to construct a new dock. Ex. 5 (Permit Application from DHF Consulting, Inc. to Atlantic Permits Section & Jacksonville Regulatory Office, U.S. Army Corps of Engineers at 2004-2011, Jun. 28, 2010). Similar to the diagrams of the planned construction for the Pellegrinis, the diagrams supporting

---

[5] Defendant has not been able to locate a federal permit application or state use authorization for a dock for Ms. Ebel's property, nor have Plaintiffs specifically alleged that a federal permit and state use authorization were obtained for Ms. Ebel's property.

Ms. Ebel's application indicate that the pilings supporting the dock and walkway would be under the mean high water mark as was the existing bulkhead. *Cf.* Ex. 15 at 1009 *with* Ex. 5 at 2020.

## II. ARGUMENT

### I. STANDARD OF REVIEW

#### a. RCFC 12(b)(6), Failure to State a Claim Upon Which Relief Can be Granted

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly,* 550 U.S. at 556). When determining whether to grant a Rule 12(b)(6) motion, the court "must accept as true all the factual allegations in the complaint" and make "all reasonable inferences in favor of the non-movant." *Sommers Oil. Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir. 2001). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly,* 550 U.S. at 555).

#### b. RCFC 56, Summary Judgment

"If, on a motion under RCFC 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56." RCFC 12(d). A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A party's assertion that a fact is not genuinely

disputed must be supported by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for the purposes of the motion only), admissions, interrogatory answers,

or other materials." RCFC 56(c)(1)(A). "A genuine issue of material fact is one that could

change the outcome of the litigation." *Mildenberger v. United States*, 91 Fed.Cl. 217, 232

(2010), *aff'd* 643 F.3d 938 (2011) (citation omitted)).

The moving party bears the initial responsibility of informing the court of the basis for its

motion, and identifying those portions of the record which it believes demonstrate the absence of

a genuine issue of material fact. *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986)). The non-moving party "has the burden of producing sufficient evidence that there is a

genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in

its favor." *Id.* (citation omitted). Mere denials, conclusory statements, or not significantly

probative evidence, is insufficient to preclude summary judgment. *Id.*

### c. RCFC 12(e), Motion for More a Definite Statement

Rule 12(e) provides:

> A party may move for a more definite statement of a pleading to which a responsive
> pleading is allowed but which is so vague or ambiguous that the party cannot reasonably
> prepare a response. The motion must be made before filing a responsive pleading and
> must point out the defects complained of and the details desired. If the court orders a
> more definite statement and the order is not obeyed within 14 days after notice of the
> order or within the time the court sets, the court make strike the pleading or issue any
> other appropriate order.

The United States Court of Federal Claims has the authority to order a more definite statement

of a claim, if the complaint is "so vague or ambiguous that the [United States] cannot reasonably

prepare a response." *Gal–Or v. United States,* 93 Fed. Cl. 200, 205 (2010) (quoting RCFC

12(e)).

II.      **Plaintiffs Have No Right To Compensation For A Takings For Alleged Property Damage Occurring Within the Government's Navigational Servitude**

Plaintiffs assert that they have a right to compensation for the "value of property owned by the Plaintiffs," "the right to use the adjacent property," and for "property destroyed." Compl. ¶ 3. According to Plaintiffs, Defendant's dredging of the St. Johns River caused the collapse of Plaintiffs' seawall and "adjacent structures including docks and boathouses." *Id.* at ¶ 5. Plaintiffs appear to assert a physical takings--they have not cited any regulation as the basis for a regulatory taking--for the loss of their seawalls, docks, and boathouses.[6] Further, Plaintiffs' Complaint acknowledges the existence of the navigational servitude. *Id.* ¶ 6.

To the extent that Plaintiffs are alleging a taking of property rights in the submerged lands of the St. Johns River that are adjacent to their properties on Little Marsh Island, those claims are subject to dismissal because such property rights, if any, are subject to the federal navigational servitude and the United States' dredging of the St. Johns River was for the purpose of improving the navigability of that river. Accordingly, as a matter of law, those actions did not infringe upon any property rights held by Plaintiffs to the use of the submerged lands, and Plaintiffs' takings claims should be dismissed or, in the alternative, summary judgment should be entered for the United States. *Owen v. United States*, 851 F.2d 1404, 1409 (Fed.Cir. 1988) (citing *Tri-State Materials Corp. v. United States*, 550 F.2d 1, 6, 213 Ct.Cl. 1 (1977)).

---

[6] Plaintiffs also assert a taking of uplands outside the navigational servitude that allegedly have collapsed into the St. Johns River. Compl. ¶ 6. Defendant does not seek dismissal or summary judgment as to that claim at this time.

a.    **Claims for Physical Takings and the Navigational Servitude**

A physical taking occurs "when the government itself occupies property or requires the

landowner to submit to physical occupation of its land." *Brace v. United States*, 72 Fed.Cl. 337,

358 (2006) (quoting *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1364 (Fed Cir.1999))

(internal quotations omitted).  "When the government physically takes possession of an interest

in property for some public purpose it has a categorical duty to compensate the former owner . . .

even if the Government physically invades only an easement in property." *Id.* (quoting *Brown v.*

*Legal Found. of Washington*, 538 U.S. 216, 233 (2003) and *Kaiser Aetna v. United States*, 444

U.S. 164, 179-80 (1979)).

However, no compensation is owed "for injury or destruction of a riparian owner's

property which is located in the bed of a navigable stream." *Owen*, 851 F.2d at 1409.  "The

nation's navigable waters have always been considered 'public property'" within the exclusive

control of the federal government under the Commerce Clause.  *Id.* at 1408 (citations omitted).

> This power to regulate navigation confers upon the United States a
> dominant servitude which extends to the entire stream and the
> stream bed below the ordinary high-water mark.  The proper
> exercise of this power is not an invasion of any private property
> rights in the stream or the lands underlying it, for the damage
> sustained does not result from taking property from riparian
> owners within the meaning of the Fifth Amendment but from the
> lawful exercise of a power to which the interests of riparian owners
> have always been subject to.

*Id.* (quoting *United States v. Rands*, 389 U.S. 121, 123 (1967)) (internal quotations and citations

omitted); *see also Northwest La. Fish & Game Pres. Comm'n v. United States*, 574 F.3d 1386,

1392 (Fed. Cir. 2009) ("The servitude encompasses the power to regulate the stream itself and

the lands beneath the ordinary high-water mark.").  The government's servitude is dominant over

the rights of the title holder "upon the determination of Congress to improve navigation." *Owen*, 851 F.2d at 1408.

In addressing a takings claim in the case of a navigable servitude, several threshold issues arise. The first is whether the government's actions were authorized. *City of Gettysburg, S.D., v. United States*, 64 Fed.Cl. 429, 438 (2005) (citations omitted). The second is whether the body of water constitutes "navigable waters of the United States." *Id.* at 438, n.5 (discussing *Alameda Gateway Ltd. v. United States,* 45 Fed.Cl. 757, 764 (1999)). The third is whether the plaintiff has a cognizable property interest. *Id.* at 439 (citation omitted). If Congress has authorized improvements to navigation within navigable waters of the United States, the "United States has the power to invade property rights in land within the bed of the stream (which includes all lands below the ordinary high-water mark), without paying compensation, when the purpose of the invasion is to aid in the navigability of the stream." *Id.* at 442 (citations omitted). If the improvements to navigation result in erosion, the navigational servitude does not apply to land located above or outside the bed of the stream as delineated by the high-water mark at the time of the construction. *Owen*, 851 F.2d at 1412.

     **b.**    **Plaintiffs' Complaint Asserts, On Its Face, A Non-Compensable Takings Claim Within the Navigational Servitude.**

Plaintiffs claim for damages to their docks, seawalls, and boathouses, fails on its face because it acknowledges the existence and exercise of the navigational servitude by which the claim is non-compensable.[7] In the first three paragraphs of the Complaint, Plaintiffs assert they are riparian land owners with a cognizable property interest in "adjacent property." Compl. ¶¶ 1-

---

[7] Although Plaintiffs' Complaint lacks any dates, Defendant assumes for purposes of its argument that the alleged harm to Plaintiffs' property occurred in 2008 and 2010 consistent with their prior claims. *See Pellegrini*, 103 Fed.Cl. at 49; Ex. 17 (Standard Form 95, Claim for Damage, Injury, or Death, Don and Brenda Pellegrini, Jan. 12, 2010); Ex. 18 (Standard Form 95, Claim for Damage, Injury, or Death, Anne Ebel, Mar. 1, 2010).

3. Although Plaintiffs are vague concerning the "adjacent property," it appears their alleged property rights are in the use of the adjacent submerged lands for the maintenance of docks and boathouses referenced in paragraph 5 of the Complaint.

Plaintiffs are the owners of riparian land in Jacksonville, Florida, that is adjacent to the St. Johns River, as alleged in their Complaint. Plaintiffs also allege a "right to use" the adjacent submerged lands of the St. Johns River. Although Plaintiffs are alleging a taking of this right to use the adjacent submerged lands, it is well established under Florida law that these submerged lands are owned by the state. Fla. Const. art. X, § 11; *Stop the Beach Renourishment, Inc., v. Fla. Dept. of Environmental Protection*, 560 U.S. 702, 707-08 (2010). Moreover, permission from the state to perform activities on public lands in Florida are mere licenses and do not rise to the level of a protectable property interest under the law of inverse condemnation. *Coastal Petroleum v. Chiles*, 701 So.2d 619, 625 (Fla. App. 1997) (discussing *Marine One, Inc. v. Mantee County*, 898 F.2d 1490 (11th Cir. 1990)). Therefore, Plaintiffs have failed to articulate in their Complaint a cognizable property interest as it relates to the use of the states' submerged lands.

In addition, even to the extent the Plaintiffs, as riparian landowners, can be said to have a "right to use" the adjacent submerged lands, any such right is subject to the navigational servitude held by the United States. Plaintiffs allege in paragraphs 3 and 5 of the Complaint that the Corps conducted dredging activities which Plaintiffs refer to as the "St. Johns River Maintenance Dredge Project" in the "center channel" proximate to their riparian property. Plaintiffs claim alleges facts that put its harm to "the right to use adjacent property" clearly within the navigational servitude. Compl. ¶¶ 1, 2, and 3. The navigational servitude of the United States "is derived from the principle that all navigable waters in the United States are

considered public property." *Northwest La. Fish & Game Pres. Comm'n,* 574 F.3d at 1390

(citing *Owen*, 851 F.2d at 1408). It is well established that the physical limits of this "dominant

servitude include 'the entire . . . stream, which includes the lands below ordinary high water

mark.'" *Id.* (quoting *United States v. Chi. Milwaukee, St. Paul, & Pac. R.R.*, 312 U.S. 592, 596-

97 (1941)). "The United States possesses the requisite authority to improve navigable waters of

the United States in the interest of improving navigation. 33 U.S.C. § 1 *et seq.*; *see also United*

*States v Kansas City Life Ins. Co.*, 339 U.S. 799, 804 (1950). The Corps has been delegated with

the responsibility of care and guardianship of the navigable waters of the United States. 33

U.S.C. § 1 *et seq.*; 33 C.F.R. § 322.5 (2004)." *City of Gettysburg, S.D.*, 64 Fed. Cl. at 439.

When the United States exercises its dominant servitude to improve the navigability of the

waters of the United States, those actions do not constitute:

> an invasion of any private property right in such lands for which
> the United States must make compensation. The damage sustained
> results not from a taking of the riparian owner's property in the
> stream bed, but from the lawful exercise of a power to which that
> property has always been subject.

*Northwest La. Fish & Game Pres. Comm'n*, 574 F.3d at 1390 (quoting *Chi. Milwauke*e, 312 U.S.

at 596-97).

     In this case, Plaintiffs allege a taking of their property interests in the use of adjacent

submerged lands to maintain docks and seawalls built on the stream bed in navigable waters.

Plaintiffs do not allege any facts that the Defendant has taken its right to use submerged lands

aside from the state's license. Plaintiffs' Complaint alleges that the Corps conducted authorized

maintenance dredging in the shipping channel in the center of the St. Johns River. Compl. ¶¶ 3,

5. It also acknowledges the navigational servitude. Compl. ¶ 6. Therefore, the sum total of

facts is determinative that, to the extent Plaintiffs are alleging a taking of their right to use of the

submerged lands of the St. Johns River adjacent to their property, any such rights are subject the

United States' exercise of its dominant navigational servitude. Any harm to property located within the physical limits of the navigational servitude is, as a matter of law, non-compensable. *Owen*, 851 F.2d at 1409. Therefore, those portions of Plaintiffs' Complaint, on its face, asserting such a claim should be dismissed for failure to state a claim upon which relief may be granted.

      **c.**      **The Jacksonville Harbor Navigation Project Was A Congressionally Authorized Project Within the Navigable Waters of the United States, And to the Extent Plaintiffs Possess a Cognizable Property Interest in Their Adjacent Property or Their Permits to Build on State Submerged Lands, The United States Navigational Servitude is Dominant and Plaintiffs May Not Claim Compensation.**

Documents categorically demonstrate that Plaintiffs assert a non-compensable claim for damages within the navigational servitude and summary judgment should be entered for Defendant on those portions of Plaintiffs' claim. First, there is no dispute that the St. Johns River is a navigable waterway and that the Corps' dredging of that river was done to improve navigability. Congress authorized the Corps emergency and maintenance dredging as part of the Jacksonville Harbor Navigation Project in the Water Resource Development Act of 1999. Pub. L. No. 106-53, § 101(a)(17), 113 Stat. 269, 276. The Corps conducted dredging in 2008 and 2010, pursuant to that authority. *See* Exs. 1, 6, & 8. Second, the St. Johns River is a navigable waterway.[8] From the earliest records, the depth of the river provided for navigation. Ex. 1 (1998 Final Feasibility Report at 7-8 (describing the St. Johns River in the vicinity of Jacksonville in about 1562). Since 1869, the United States has had an interest in improving navigation on the St. Johns River and has funded improvements from time to time since then. *Id.* at 4. The Corps granted the Pellegrinis a permit to build their structures, however, nothing in that permit limits the federal governments' exercise of its navigational servitude to improve

---

[8] To evaluate the question of whether the St. Johns River is a navigable waterway, Defendants apply the four criteria of *Kaiser Aetna v. United States*, 444 U.S. 164, 171 (1979) as discussed in *Alameda Gateway, Ltd*, 45 Fed.Cl. at 764-770.

navigation in the St. Johns River. Ex. 15 (Pellegrini Permit Approval at 1001-1004).[9] Finally, the courts have repeatedly recognized the St. Johns River as a navigable waterway. *See e.g.*, *Canadian Pacific (Bermuda) Ltd., v. United States*, 534 F.2d 1165, 1166 (5th Cir. 1976); *United States v. Tilton*, 705 F.2d 429, 430 (11th Cir. 1983); *Mass. Bonding & Ins. Co. v. Lawson*, 149 F.2d 853 (5th Cir. 1945).

The Corps dredged the St. Johns River shipping channel in Cuts 40 and 41 in 2008 and 2010. Ex. 8 (Contract Modification, W912EP-07-C-0015); Ex. 10 (Solicitation, Offer, and Award, to Great Lakes Dredge & Dock Co., LLC, dated Jan. 22, 2010). The dredging in Cut 40 occurred on the opposite side of the shipping channel from Plaintiffs' property. Ex. 7 (2007 Contract Mod. Letter at drawing no. 22/54). The dredging in Cut 41 was in the middle of the Fulton Cut, where two channels of the river meet. *Id.* at 23/54. Nevertheless, Plaintiffs have claimed in the past, and here, that those dredging projects directly caused the loss of their docks, seawalls, and boathouses. Compl. ¶ 7; Ex. 17 (Standard Form 95, Claim for Damage, Injury, or Death, Don and Brenda Pellegrini, Jan. 12, 2010); Ex. 18 (Standard Form 95, Claim for Damage, Injury, or Death, Anne Ebel, Mar. 1, 2010). However, no compensation is owed "for injury or destruction of a riparian owner's property, such as a dock and seawall, which is located in the bed of a navigable stream." *Owen*, 851 F.2d at 1409. It is beyond dispute that Plaintiffs' claims are for structures in the bed of the navigable stream, the St. Johns River, as a result of authorized activity undertaken to improve the navigability of that stream. Ex. 16 (E-mail, with forwards, from Brenda Pellegrini to various officials of the Port of Jacksonville, Mar. 28, 2008, pages 3003-3008); Ex. 15 (Pellegrini Permit Approval); Ex. 5 (Permit Application from DHF

_____

[9]  As noted above, Defendant has been unable to locate a federal permit or state authorization for Ms. Ebel's structures as they existed in 2008-2010.

Consulting, Inc. to Atlantic Permits Section & Jacksonville Regulatory Office, U.S. Army Corps of Engineers, Jun. 28, 2010, at 2016, 2020).

Plaintiffs lack a compensable property right in the submerged lands of the St. Johns River adjacent to their riparian properties. *Coastal Petroleum*, 701 So.2d at 625. Their use of the adjacent submerged lands is subject to the dominant navigational servitude of the United States. *Owen*, 851 F.2d at 1408. Where, as here, the United States had authority to make improvements for navigation in navigable waters, it has a dominant navigational servitude over any subservient rights held by Plaintiffs. *Id.* at 1408-09. Therefore, to the extent that Plaintiffs' Complaint seeks compensation for the alleged taking of their use of the submerged lands adjacent to their riparian properties, such claims are non-compensable and summary judgment should be entered in favor of the United States.[10]

## III.  **Plaintiffs' Remaining Claims Lack Dates To Support Their Allegations and Are Vague and Ambiguous**

RCFC 12(e) permits a party to move for a more definite statement of a pleading if the pleading is so vague and ambiguous that the party is unable to prepare a response. Plaintiffs' Complaint lacks any dates describing when the material events occurred giving rise to their cause of action. Although Defendant is cognizant of the prior claims filed by Plaintiffs, the Complaint on its face should provide a clearer statement of the dates Plaintiffs alleged the United States performed acts that caused Plaintiffs injury. A more definite statement by Plaintiffs of the dates at issue would permit Defendants to provide a response without guessing, or surmising, the dates based on the history of these claims, which have never been factually developed. At this point, Defendant could provide a response but with substantial risk of Plaintiffs later suggesting other

---

[10]  Defendant notes that Plaintiffs have not alleged any claim in their Complaint related to common law littoral rights. *See*. *Mildenberger,* 643 F.3d at 948-49. Plaintiffs appear to be basing their claim on property rights related to structures on the states' sovereign submerged lands.

claims are included that are not now apparent or known. Defendant should not have to move forward in the litigation unaware of the entirety of the claim.

For the same reason, Plaintiffs should provide dates in the Complaint of the alleged injury. Even assuming the dates of the alleged acts of the Corps are made clearer, Plaintiffs' claim must provide dates of injury. As currently submitted, Plaintiffs' claim might be read to be either a direct causal claim under an accrual theory, *see Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1455 (Fed. Cir. 1997); *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994), or a longer term erosion claim to which the stabilization doctrine applies, *see Mildenberger*, 643 F.3d at 944-49. For example, Plaintiffs' Complaint provides that the Corps dredging caused a loss of subjacent support for the banks of the river, Compl. ¶ 5, and past claims have asserted specific harm on March 8, 2008. *See* Exs. 17 & 18. This appears to present an accrual claim. However, the Corps did not dredge in 2008 until March 15 through 19. Ex. 9 at reports 226-230. On the other hand, if Plaintiffs are asserting harm due to longer term erosion, Plaintiffs provide insufficient facts to analyze at the pleadings phase whether a valid stabilization type claim has been stated and whether Plaintiffs have brought their claim within the statute of limitations.

Finally, Plaintiffs statement of the cognizable property interest of the Pellegrinis and Ms. Ebel is vague and ambiguous. Aside from the uplands claim, the Complaint only asserts an interest in "adjacent property" without providing the basis of that interest. Owning riparian land provides some common law littoral rights, *Mildenberger,* 643 F.3d at 948-49, but those are not the rights that Plaintiffs appears to be asserting. Therefore, Plaintiffs should be required to file a more definite statement for any remaining claims regarding the nature and extent of the property right allegedly taken, the date of the actions that allegedly resulted in a taking of each identified

property right, the date of the alleged taking of each right, and the specific damage that the

actions identified as the alleged takings caused to Plaintiffs' property.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant respectfully requests that the Court grant this

motion and dismiss Plaintiffs' Complaint for failure to state a claim with respect to the adjacent

submerged lands that are subject to the federal government's dominant navigational servitude, or

that the Court grant summary judgment in favor of the United States as to such claims.   As to

Plaintiffs' remaining claims involving its riparian lands, Defendant requests that the Court grant

its motion and order Plaintiffs to file a more definite statement under RCFC 12(e).


 Dated: May 5, 2014                                Respectfully submitted,

                                                   ROBERT G. DREHER
                                                   Acting Assistant Attorney General
                                                   Environment & Natural Resources Division


                                                   */s/Stephen Finn*
                                                   STEPHEN FINN
                                                   Trial Attorney
                                                   Environment & Natural Resources Division
                                                   P.O. Box 7611
                                                   Washington, D.C. 20044-7611
                                                   Tel:    (202) 305-3284
                                                   Fax:    (202) 514-8865
                                                   stephen.finn@usdoj.gov

                                                   SHELDON G. SHUFF
                                                   SUSAN E. SYMANSKI
                                                   Assistant District Counsel
                                                   US Army Corps of Engineers
                                                   Jacksonville District
                                                   701 San Marco Blvd
                                                   Jacksonvill, FL 32207

                                                   Attorney for the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 5, 2014, I electronically served a true and correct copy of the foregoing Motion to Dismiss, in Part, or, in the Alternative, for Summary Judgment, and for a More Definite Statement, by using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following counsel of record for Plaintiff:

G.J. Rod Sullivan, Jr., Esq.
SULLIVAN & COMPANY
8777 San Jose Blvd., Suite 803
Jacksonville, FL 32217

*/s/Stephen Finn*