# In the United States Court of Federal Claims

No. 14-180L

(Filed: May 15, 2017)

| | | |
|---|---|---|
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | ) | |
| **DONALD L. PELLEGRINI, et al.,** | ) | Claim of uncompensated taking; dredging of navigable river allegedly the but-for cause of collapse of support of land and installations along banks; no jurisdiction over due process claim; disputed issues of material fact regarding takings claim |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | | |

G.J. Rod Sullivan, Jr., Sullivan & Company, Jacksonville, Florida, for plaintiffs.

Stephen Finn, Trial Attorney, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Robert G. Dreher, Acting Assistant Attorney General, Sam Hirsch, Acting Assistant Attorney General, and John C. Cruden, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C. and Sheldon G. Shuff and Susan E. Symanski, Assistant District Counsel, United States Army Corps of Engineers, Jacksonville District, Jacksonville, Florida.

**OPINION AND ORDER**

LETTOW, Judge.

Plaintiffs, Donald and Brenda Pellegrini and Anne Ebel, bring suit against the United States ("the government"), alleging that the government, acting through the United States Army Corps of Engineers ("Army Corps"), committed an uncompensated taking of their property in contravention of the Fifth Amendment.  Plaintiffs' property in Jacksonville, Florida is adjacent to the St. Johns River, where the Army Corps has been conducting dredging activities to improve the navigability of the river since 1869.  Plaintiffs allege that the Army Corps' recent dredging of the St. Johns River has resulted in a loss of support along the banks of the river, which has allegedly caused their seawall, docks, boathouses, and adjacent structures to collapse.

Pending before the court is the government's motion to dismiss plaintiffs' complaint in part for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment, and for a more definite statement.  For the reasons stated, the government's motion to dismiss is granted with respect to plaintiffs' due process claim, but its motion to

dismiss plaintiffs' takings claim, alternative motion for summary judgment, and request for a more definite statement are denied.

## BACKGROUND

### *A. Dredging of the St. Johns River*

The events underlying this dispute relate to the Army Corps' dredging of the St. Johns River in Jacksonville, Florida.  *See* Compl. ¶¶ 3, 5-6.  The St. Johns River "rises in east-central Florida," flowing "northerly for 257 miles to Jacksonville . . . and thence easterly 28 miles in a winding course to the Atlantic Ocean."  Def.'s Mot. to Dismiss, in Part, or, in the Alternative, for Summary Judgment, and for a More Definite Statement ("Def.'s Mot."), Ex. 2 (Letter from the Secretary of War to the Chairman of the United States Senate Committee on Commerce, S. Doc. No. 79-179 (1946) ("S. Doc. No. 79-179")) at 2, ECF No. 6-3.[1]  The government has demonstrated an interest in the navigability of the St. Johns River since 1869, and the river has been the subject of many navigability reports and projects.  Def.'s Mot., Ex. 1 (U.S. Army Corps of Engineers, Jacksonville Harbor Duval County, Florida Navigation Study, Final Feasibility Report (Sept. 1998) (revised Nov. 4, 1998) ("Feasibility Report")) at 4-6, ECF Nos. 6-1 & 6-2; *see also* S. Doc. No. 79-179 at 9.

Relevant here, the government has specifically sought to improve the navigability of the river "from Jacksonville to the Atlantic Ocean for deep draft commercial vessels."  Feasibility Report at 4.  In its original condition, that segment of the river contained depths of approximately "12 feet at mean low water."  Def.'s Mot., Ex. 3 (Annual Report of the Chief of Engineers, Extract, Report Upon the Improvement of Rivers and Harbors in the Jacksonville, Fla., District (1922)) at 776, ECF Nos. 6-3 & 6-4.  In 1895, a completed navigation project resulted in "a dredged channel with depths generally of 15 feet over the bar and 18 feet in the river to Jacksonville."  Def.'s Mot., Ex. 4 (Letter from the Secretary of the Army to the United States House of Representatives Committee on Public Works, H.R. Doc. No. 89-214 (1965) ("H.R. Doc. No. 89-214")) at 13, ECF No. 6-4.  By 1946, 23 miles of the 28-mile segment between Jacksonville and the Atlantic Ocean had been "dredged to provide a continuous depth of 30 feet or more at local mean low water," with "the remaining 5 miles hav[ing] natural depths of 30 feet or over."  S. Doc. No. 79-179 at 5.  However, navigability remained difficult and dangerous, particularly at Dames Point, a bend at Clapboard Creek, and a bend at St. Johns Bluff.  *See id.* at 23-24.  The government addressed these concerns by dredging a 34-foot "cut-off channel" below Blount Island that stretched "from St. Johns Bluff (Fulton) to Dame Point,"[2] dredging the main channel to 34 feet, and proposing further dredging of the river to 38 feet.  *See* H.R. Doc. No. 89-214 at 13-14, 24.  Plaintiffs' properties, which are adjacent to the St. Johns River on Ramoth

---

[1] The government filed a corrected version of the motion, to address minor typographical errors, ECF No. 14.  Citations to the government's brief will therefore refer to that corrected version.  The government's exhibits remain attached to its original motion, ECF No. 6.

[2] A channel already existed to the north of Blount Island, but it was not frequently used after the government conducted the dredging of the channel below Blount Island.  *See* H.R. Doc. No. 89-214 at 14.

Drive in Little Marsh Island, *see* Compl. ¶¶ 1-2, 5; Def.'s Mot., Ex. 5 (St. Johns River Vicinity Map) at 002017, ECF No. 6-5, are located east of Blount Island in close proximity to St. Johns Bluff, Clapboard Creek, and the two channels surrounding Blount Island.  A navigational chart provides an illustration of the relevant portion of the St. Johns River in its present state:



National Oceanic and Atmospheric Administration, Office of Coast Survey, http://www.charts.noaa.gov/OnLineViewer/11491.shtml.

In 1998, the Army Corps proposed channel realignment and construction within the St. Johns River, *see* Feasibility Report at 7-8, including deepening the river to 39 feet at cuts 40 to 41, *id.* at 52-53, which plaintiffs allege is adjacent to their property, Compl. ¶ 5.  Congress thereafter authorized a navigation project in the Jacksonville Harbor, including the St. Johns River, through the Water Resources Development Act of 1999, Pub. L. No. 106-53, § 101(a)(17), 113 Stat. 269, 276.  Pursuant to that authority, in March 2008, the Army Corps modified a contract with the Norfolk Dredging Company to encompass emergency dredging between cuts 10 and 43 of the St. Johns River.  Def.'s Mot., Ex. 8 (Contract No. W912EP-07-C-0015, Amendment No. P00004 (signed Mar. 1 and 5, 2008)), ECF No. 6-6.  The dredging in cuts 40 and 41 occurred that same month from March 15 to 19, 2008, Def.'s Mot., Ex. 9 (Contractors Quality Control Report (QCR), Daily Log of Construction, Contract No. W912EP-07-C-0015, Report Nos. 226-30 (Mar. 15-19, 2008)), ECF No. 6-6, with additional dredging in cut 41 in May 2010 as well, Def.'s Mot., Ex. 12 (Contractors Quality Control Report (QCR), Daily Log of Construction, Contract No. W912EP-07-C-0016, Report Nos. 90-91 (May 13-14, 2010)), ECF No. 6-7.

*B. Prior Procedural History*

In March 2008, the Pellegrinis notified the Jacksonville Port Authority of damage to their dock and boats, alleging that such damage was caused by the Army Corps' dredging. Def.'s Mot., Ex. 16 (E-mail correspondence between the Pellegrinis and Jacksonville Port Authority officials (Mar. 28, 2008)) at 003001-2, ECF No. 6-8. In 2010, the Pellegrinis and Ms. Ebel also filed administrative claims with the Army Corps in which they asserted that on March 8, 2008, the dredging activities in the St. Johns River caused a collapse of "the banks of the river and the underlying sand" supporting their property, resulting in damage to their docks and vessels. Def.'s Mot., Ex. 17 (Standard Form 95, submitted by Donald and Brenda Pellegrini (Jan. 12, 2010)), ECF No. 6-9; Def.'s Mot., Ex. 18 (Standard Form 95, submitted by Anne Ebel (Mar. 1, 2010)), ECF No. 6-9.[3] The Army Corps denied both claims after determining that the dredging had not caused the damage to plaintiffs' property. Def.'s Mot., Ex. 19 (Letter from Gregory S. Mathers, United States Army, Tort Claims Division to Anne Ebel (May 27, 2010)), ECF No. 6-9; Def.'s Mot., Ex. 20 ((Letter from Gregory S. Mathers, United States Army, Tort Claims Division to Donald and Brenda Pellegrini (June 2, 2010)), ECF No. 6-9.

Plaintiffs subsequently filed suit in this court on April 11, 2011, alleging that the Army Corps' dredging activity resulted in a taking of their property without just compensation in contravention of the Fifth Amendment. *See Pellegrini v. United States*, 103 Fed. Cl. 47, 48-49 (2012). The Pellegrinis' and Ms. Ebel's claims were dismissed without prejudice pursuant to 28 U.S.C. § 1500, however, because they had previously filed a negligence claim against the government in the United States District Court for the Middle District of Florida that remained pending when they brought suit in this court. *Pellegrini*, 103 Fed. Cl. at 49, 53.[4] The court found that plaintiffs' claim in district court, which addressed the same dredging activity, was based upon the same operative facts as plaintiffs' takings claim. *Id.*

---

[3]The Pellegrinis purchased their property in 1999, Def.'s Mot., Ex. 13 (Warranty Deed (signed Dec. 11, 1998)), ECF No. 6-7, and obtained authorization from the Army Corps and Florida Department of Environmental Protection that same year to build their single family dock, Def.'s Mot., Ex. 15 (Army Corps Approval (June 15, 1999), Florida Department of Environmental Protection Approval (May 5, 1999)) at 001001, 001044-49, ECF No. 6-7.

Ms. Ebel has owned her property since 2005, Def.'s Mot., Ex. 14 (Quit-Claim Deed (signed Nov. 1, 2005)), ECF No. 6-7, but neither party has submitted documentation to indicate that Ms. Ebel was authorized to build her dock at the time of the 2008 dredging, *see* Def.'s Mot. at 9 n.5. Ms. Ebel did, however, apply for a permit to build a new dock in 2010. Def.'s Mot., Ex. 5 (Permit Application of Ms. Ebel submitted to Atlantic Permits Section & Jacksonville Regulatory Office (June 28, 2010)) at 002004-10, ECF No. 6-5.

[4]On October 12, 2011, approximately three months before a judge of this court issued a decision applying Section 1500, the district court had dismissed plaintiffs' claims without prejudice. Order, *Ebel v. United States*, No. 3:10-CV-635-RBD-JRK (M.D. Fla. Oct. 12, 2011).

4

*C. Present Suit*

Plaintiffs filed a second suit in this court on March 5, 2014, again raising a takings claim under the Fifth Amendment as a result of the Army Corps' dredging of the St. Johns River. *See generally* Compl. Plaintiffs allege that the dredging occurred "in Cuts 40 [to] 41, in the vicinity of buoy 34, immediately adjacent to the[ir] property." Compl. ¶ 5. According to plaintiffs, the Army Corp's dredging "cause[d] a loss of lateral and subjacent support for the banks of the [St. Johns] River, and further caused [the] collapse of the [p]laintiff[s'] seawall, and adjacent structures including docks and boathouses." Compl. ¶ 5. As a result, plaintiffs allege "that their lands have collapsed into the St. Johns River and that such lands have . . . been converted from privately-owned uplands lying outside [the government's] navigational servitude into public lands lying particularly or completely below mean high water." Compl. ¶ 6. Additionally, plaintiffs allege that the Army Corps' actions violated the Due Process Clause of the Fifth Amendment. Compl. at 3.

The government responded with a motion to dismiss plaintiffs' complaint in part for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment, and for a more definite statement. Def.'s Mot. The motion was fully briefed, including supplemental briefing regarding the high-water mark, and hearings were held on December 3, 2014 and June 30, 2015 before Judge Wolski. After the case was reassigned on March 30, 2017, ECF No. 33, an additional hearing was held before this court on April 19, 2017.

**JURISDICTION**

Plaintiffs have the burden of establishing jurisdiction. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). Pursuant to the Tucker Act, the court has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act waives sovereign immunity and thus allows plaintiffs to sue the United States for money damages, *United States v. Mitchell*, 463 U.S. 206, 212 (1983), but it does not provide plaintiffs with any substantive rights, *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, plaintiffs "must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part) (citing *Mitchell*, 463 U.S. at 216; *Testan*, 424 U.S. at 398).

Here, the court has jurisdiction over plaintiffs' takings claim. *See, e.g.*, *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 12 (1990); *Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.") (citation omitted); *Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005) (noting that a takings claim need only be non-frivolous for this court to find jurisdiction under the Tucker Act). Nonetheless, the court's jurisdiction does not encompass plaintiffs' due process claim. *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (explaining that the Due Process

5

Clause of the Fifth Amendment does not provide this court with jurisdiction because it is not money-mandating) (citing *Carruth v. United States*, 627 F.2d 1068, 1081 (Ct. Cl. 1980)).

## STANDARDS FOR DECISION

Under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), the court must examine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To avoid dismissal, the facts alleged "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Kam-Almaz v. United States*, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). The court must accept all factual allegations in the complaint as true and draw "all reasonable inferences in favor of the non-movant," *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted), but the court need not accept legal conclusions, *Rack Room Shoes v. United States*, 718 F.3d 1370, 1376 (Fed. Cir. 2013) (citing *Iqbal*, 556 U.S. at 678).

Under RCFC 56(a), a grant of summary judgment is proper when the pleadings, affidavits, and evidentiary materials of the case demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). A genuine dispute exists when the issue "may reasonably be resolved in favor of either party," *id.* at 250, and a fact is considered material when it "might affect the outcome of the suit under the governing law," *id.* at 248. The moving party has the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court therefore draws all factual inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Summary judgment will be appropriate if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* at 587.

## ANALYSIS

### A. The Government's Navigational Servitude

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Only persons with a "legally protected property right" at the time of the taking will be entitled to compensation. *See Northwest La. Fish & Game Pres. Comm'n v. United States*, 574 F.3d 1386, 1390 (Fed. Cir. 2009) (citing *United States v. Willow River Power Co.*, 324 U.S. 499, 503 (1945)). Additionally, the government's actions must have been a "direct and proximate cause" of the harm to plaintiffs' property. *Loesch v. United States*, 645 F.2d 905, 913 (Ct. Cl. 1981) (citations omitted).

In the context of a waterway, navigable waters are "considered 'public property' and since the early days of the nation have been under the exclusive control of the federal government under the Commerce Clause." *Owen v. United States*, 851 F.2d 1404, 1408 (Fed.

Cir. 1988) (en banc) (citing *Gilman v. Philadelphia*, 70 U.S. (3 Wall.) 713, 724-25 (1866); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824)).  The government's power to regulate commerce includes the authority to regulate the nation's navigable waters, which "confers upon the United States a 'dominant servitude.'"  *United States v. Rands*, 389 U.S. 121, 122-23 (1967) (citing *Federal Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 249 (1954)).  "An interest that 'arises from access to, and use of, navigable waters' falls within the [g]overnment's dominant servitude, and any private interest is subservient to that servitude."  *Northwest La. Fish & Game Pres. Comm'n*, 574 F.3d at 1390 (quoting *Rands*, 389 U.S. at 124-25).  This navigational servitude includes the authority to deepen waters over submerged lands, through processes such as dredging, for purposes of improving navigability.  *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 88 (1913).  The government's exercise of power within the navigational servitude is not a taking because it "is not an invasion of any private property right in such lands for which the United States must make compensation."  *United States v. Chicago, Milwaukee, St. Paul & Pac. R.R.*, 312 U.S. 592, 596-97 (1941); *see also Owen*, 851 F.2d at 1408.

Nonetheless, the navigational servitude does not create "a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation."  *Kaiser Aetna v. United States*, 444 U.S. 164, 172 (1979).  The servitude is limited by its scope, which includes the navigable waterway itself and "the lands beneath and within [the waterway's] high-water mark."  *Owen*, 851 F.2d at 1410 (quoting *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 628 (1961)); *see also Chicago, Milwaukee, St. Paul & Pac. R.R.*, 312 U.S. at 596-97 ("The dominant power of the federal [g]overnment, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below [the] ordinary high water mark.").[5]  The mean high-water mark is measured by "the average height of all the high waters" in the pertinent waterway over an 18.6 year period.  *Borax Consol.*, 296 U.S. at 26-27; *see also* Def.'s Suppl. Br. at 4-5 (explaining that the average water heights are obtained through a network of measurement stations, titled the National Water Level Observation Network).  Affected properties located within the bed of the waterway below that mark do not present cognizable takings claims, *Owen*, 851 F.2d at 1409 (citing cases), whereas affected properties above or beyond the high-water mark, described as fast lands, can be compensable, *see Kaiser Aetna*, 444 U.S. at 177-78 (citing cases); *Willow River Power*, 324 U.S. at 509.

---

[5]As the government notes, courts have often referred to the "ordinary high-water mark" and "mean high-water mark" without distinguishing between the two terms.  *Compare Northwest La. Fish & Game Pres. Comm'n*, 574 F.3d at 1392 (referring to "ordinary"), *with Applegate v. United States*, 35 Fed. Cl. 406, 412 (1996) (referring to "mean").  Because the relevant portion of the St. Johns River is tidal, *see* Feasibility Report at 14, the mean high-water mark is appropriate here, *see Borax Consol. v. City of Los Angeles*, 296 U.S. 10, 26-27 (1935) (applying the mean high-water mark for tidal waters); *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 745-49 (9th Cir. 1978); Def.'s Suppl. Br. at 1-4, ECF No. 23.

### B. *Plaintiffs' Takings Claim*

The government asserts that plaintiffs do not present a viable takings claim to the extent that such claim relates to submerged lands in the St. Johns River,[6] a navigable waterway that is subject to the navigational servitude. Def.'s Mot. at 12-19.[7] In support, the government argues that the scope of the servitude, as defined by the mean high-water mark, should be determined in 2008 and 2010, the dates of the dredging that allegedly caused the damage to plaintiffs' properties. Def.'s Reply in Support of Mot. to Dismiss, in Part, or, in the Alternative, for Summary Judgment, and for a More Definite Statement ("Def.'s Reply") at 9-10, ECF No. 15. Plaintiffs respond that the scope of the servitude is defined by the mean high-water mark in 1845, the time Florida became a state, and that the mark does not change over time. Pls.' Suppl. Br. at 3-7, ECF No. 30. Plaintiffs contend that under their interpretation of the mean high-water mark, all of the properties at issue fall outside of the navigational servitude. *See* Pls.' Opp'n at 2-3.

The court need not now resolve the disputed time period for measuring the mean high-water mark because that boundary remains undefined with respect to plaintiffs' property, regardless of which measure applies, and thus a factual issue is presented that is not appropriately resolved at this stage of the proceedings.[8] Determining whether a taking has

---

[6]The government is not seeking dismissal or summary judgment, however, of plaintiffs' takings claim for fast lands located above or beyond the mean high-water mark. *See* Def.'s Mot. at 12 n.6; Hr'g Tr. 16:20-23 (Apr. 19, 2017).

[7]Plaintiffs rely on *Kaiser Aetna*, 444 U.S. 164, to contend that the pertinent segment of the St. Johns River is not navigable because, according to plaintiffs, only part of the river was navigable in its natural state, but not the portion of the river adjacent to plaintiffs' property. *See* Pls.' Resp. to Def.'s Mot. to Dismiss in Part, or, in the Alternative, for Summary Judgment, and for More Definite Statement ("Pls.' Opp'n") at 2-3, 8-9, ECF No. 11; *see also Kaiser Aetna*, 444 U.S. at 178-79 (examining whether the relevant waterway was navigable in its natural state). Taken most broadly, however, plaintiffs' argument is misplaced because the navigational servitude extends from one side of a navigable waterway to the other, and is thus "not limited to the thread of the stream where vessels pass." *Allen Gun Club v. United States*, 180 Ct. Cl. 423, 429 (1967) (citation omitted); *see also Mildenberger v. United States*, 91 Fed. Cl. 217, 249 (2010) (noting that the servitude is "not limited to those portions of a river or stream that are actually navigable in fact") (citing *Allen Gun Club*, 180 Ct. Cl. at 429), *aff'd in part*, 643 F.3d 938 (Fed. Cir. 2011).

[8]Relevant precedents regarding the navigational servitude do not address the precise time in which the mean high-water mark is measured under the circumstances pertinent here. *See, e.g., Rands*, 389 U.S. at 123 (explaining only that the high-water mark defines the scope of the navigational servitude); *Borax Consol.*, 296 U.S. at 26-27 (stating that the high-water mark is averaged over approximately 19 years, but not specifying when that time period begins in the context of multiple dredging projects); *Northwest La. Fish & Game Pres. Comm'n*, 574 F.3d at 1390 (stating only that the high-water mark includes "the entire . . . stream") (quoting *Chicago, Milwaukee, St. Paul & Pac. R.R.*, 312 U.S. at 596-97); *see also Kaiser Aetna*, 444 U.S. at 178-79 (examining whether the relevant waterway was navigable in its natural state for the purpose of

occurred, specifically in the context of the government's navigational servitude, is "often decided on the basis of narrow, factual distinctions," and therefore is "rarely proper for resolution on the pleadings." *Owen*, 851 F.2d at 1416 (citing *Kaiser Aetna,* 444 U.S. at 175; *Loesch*, 645 F.2d at 913). Tellingly, although the government notes that the high-water mark is measured "at the time of the construction," *id.* at 1412, a significant number of construction projects have been undertaken in the relevant portion of the St. Johns River since 1869, with many of those projects encompassing substantial dredging of the river bed, *see, e.g.*, Feasibility Report at 4-6. This dredging has not only deepened the river for purposes of navigability, but it has also affected the banks of the river and the boundary of the mean high-water mark. As the river changes in response to that dredging, the scope of the mean high-water mark shifts as well. *See Owen*, 851 F.2d at 1410 ("There must also be horizontal limits to the 'bed' of a river; otherwise, the navigational servitude would extend infinitely in all directions and swallow up any claim for 'just compensation' under the Fifth Amendment for damages occurring anywhere below the elevation of the high-water mark.") (citing *Kaiser Aetna,* 444 U.S. at 177).

Here, plaintiffs claim that the dredging of the St. Johns River resulted in a loss of support along the banks of the river, allegedly causing their seawall, docks, boathouses, and adjacent structures to collapse. Compl. ¶¶ 5-6. Although submerged lands within the mean high-water mark are subject to the navigational servitude, the appropriate boundaries are undefined with respect to the improvements on plaintiffs' property that were destroyed, such as the seawall, bulkheads, and adjacent structures. "[I]t is not the location of the *cause* of the damage that is relevant, but the location and permanence of the *effect* of the government action causing the damage that is the proper focus of the taking analysis." *Owens*, 851 F.2d at 1412 (emphasis in original) (citing *United States v. Cress*, 243 U.S. 316 (1917); *Tri-State Materials Corp. v. United States*, 550 F.2d 1, 4 (Ct. Cl. 1977); *Goose Creek Hunting Club, Inc. v. United States*, 518 F.2d 579, 583 (Ct. Cl. 1975)). The effect of the Army Corps' dredging on plaintiffs' property, and the extent to which their properties fall within the mean high-water mark, are issues that cannot be addressed without further factual development. Plaintiffs have therefore presented a plausible takings claim upon which relief could be granted, and the claim turns on disputed issues of material fact. Accordingly, dismissal of plaintiffs' complaint or a grant of summary judgment is not appropriate.

### C. The Government's Request for a More Definite Statement

The government also requests a more definite statement from plaintiffs, asserting that the complaint fails to sufficiently provide the dates of the underlying events and the details of plaintiffs' property interests. *See* Def.'s Mot. at 19-21. Despite these assertions, the government's filings and extensive documentation accompanying its motion demonstrate that it sufficiently understands plaintiffs' takings claim. The documents provided by the government, many of which were cited *supra*, delineate the changes to the navigable channel and dredging activity within the St. Johns River. Further, the documents indicate the time of the collapse of support and the property interests underlying plaintiffs' claim. Thus, the government's motion for a more definite statement is denied.

---

determining navigability, but not addressing the scope of the high-water mark or when that mark is measured).

**CONCLUSION**

For the reasons stated, the government's motion to dismiss plaintiffs' complaint is GRANTED insofar as plaintiffs' due process claim is concerned, but is otherwise DENIED. The government's alternative motion for summary judgment is DENIED, as is the government's motion for a more definite statement.

The government shall file its answer to plaintiffs' complaint on or before the time specified in RCFC 12(a)(4).

It is so **ORDERED.**

s/ Charles F. Lettow
Charles F. Lettow
Judge